PDK/TFH

✓ FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

1:07 pm, Jul 17 2023

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ JJ _____ Deputy

## IN THE UNITED STATES DISTRICT COURT FOR
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: A BLACK AND GREEN SAMSUNG CELLULAR TELEPHONE STORED IN EVIDENCE AS ATF EXHIBIT #53 | CASE NO.       23-mj-1508-AAQ |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Brown, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for a black and green Samsung cellular telephone stored in evidence as "ATF Exhibit #53" and further described in Attachment A, hereinafter, the "**SUBJECT DEVICE**," for the things described in Attachment B.  This affidavit is made in support of an applications for the search warrant under Federal Rules of Criminal Procedure 41(c), 41(e)(2)(A), and 41(e)(2)(B).

2.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") since 2015.  I graduated from the Criminal Investigator Training Program and ATF Special Agent Basic Training.  I am currently assigned to the Washington Field Division in Washington, D.C.  My assignments include investigating the illegal possession and transfer of firearms, as well as violent crimes involving firearms.  During these investigations, I have analyzed records; participated in the search and seizure of phone, email, and social media accounts; conducted mobile and static surveillance; conducted interviews; prepared and sworn criminal complaints; and participated in the execution of search and arrest warrants.

3.      Based on my training, experience, and participation in firearms investigations,

and the training and experience of other law enforcement agents with whom I am working on this investigation, I know that:

    a.  It is common for individuals engaged in the illegal trafficking/possession of firearms to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the sale of firearms, illegal proceeds of such trafficking, and other efforts of co-conspirators;

        i.  Individuals engaging in the illegal trafficking/possession of firearms use cellular telephones and cellular telephone technology to communicate and remain in contact with customers or possessors of those firearms; and

       ii.  Individuals who engage in the illegal trafficking/possession of firearms use cellular telephones to exchange information with customers and/or sources of supply through text messaging and instant messaging in addition to direct telephone conversations. It is also common for firearms traffickers/possessors to send photographs and videos of firearms to customers and/or source(s) of supply.

    b.  Cellular telephones used by firearms traffickers/possessors contain valuable information and evidence relating to their activities. Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data. This information can: (i) reflect the preparation for, arrangement of, and commission of the trafficking; (ii)

identify locations where traffickers traveled to before and after transporting or selling contraband; (iii) reflect the ownership and use of the cellular telephones and firearms by the traffickers; (iv) document meetings and communications between traffickers, their customers, associates, and co-conspirators; (v) reflect communications between traffickers and other individuals, discussing the trafficking and possession of firearms; (vi) reflect communications that the trafficker knew that the customer was not allowed to lawfully purchase or possess firearms; (vii) reflect communications between traffickers and other individuals who may have assisted or provided support in the trafficking or possession of the firearm(s); (viii) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or concealment of contraband relating to the trafficking; and (ix) document or contain evidence of the purchase of items from the assets derived from the trafficking of contraband.

4.      Individuals involved in firearms trafficking/possession often use cellphone cameras to take video recordings and photographs of themselves or other members of the organization often engaging in illegal activities, such as the brandishing of firearms or distribution of narcotics.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 924(a)(1)(A), knowingly making a false statement on records required to be gathered and maintained by a Federal Firearms Licensee ("FFL"), and 18 U.S.C. § 922(k), possession or transfer in interstate commerce firearms with obliterated serial numbers, have been committed by **ROBERT NMN SMITH** ("**SMITH**").[1]  There is also probable cause to search the **SUBJECT DEVICE**, further described in Attachment A, and to seize the evidence, fruits, instrumentalities, and contraband described in Attachment B relating to these violations.

## **PROBABLE CAUSE**

7.      An FFL is an individual or business licensed to engage in the business of manufacturing, importing, and/or dealing in firearms.  Federal law prohibits FFLs from selling a firearm to a non-FFL purchaser like **SMITH** "unless the [FFL] records the transaction on a firearms transaction record, Form 4473."  27 C.F.R. § 478.124(a).  Form 4473 is an ATF Firearms Transaction Record, and the C.F.R. requires FFLs to retain "as a part of the required records, each Form 4473 obtained in the course of transferring custody of the firearms."  27 C.F.R. § 478.124(b).  Accordingly, any false statement a purchaser makes on a Form 4473 pertains to information an FFL is required by law to maintain.

8.      Form 4473 requires a purchaser to disclose, among other things, the purchaser's address.  Before purchasing a handgun, most Maryland residents, with limited exceptions such as law enforcement, military personnel, and FFLs, are required by Maryland law to first obtain a

---

[1] On May 11, 2023, **SMITH** was indicted in the U.S. District Court for the Eastern District of Virginia on 24 counts of making false statements to an FFL in violation of 18 U.S.C. § 924(a)(1)(A).  *See* Crim. No. 1:23-90 (E.D. Va.).

4

Handgun Qualification License, register the handgun with the Maryland State Police, and submit to a seven-day waiting period between purchasing the handgun and receiving that handgun. Virginia has no analogous requirements.

9.      As detailed below, there is probable cause to believe that **SMITH** falsely reported Virginia residency and address information on dozens of Forms 4473 for the purpose of avoiding Maryland handgun laws and to subsequently traffic those firearms to illicit purchasers.  As each of the recovered firearms below also had its serial number obliterated, there is probable cause to believe that **SMITH** obliterated those numbers to avoid the firearms he sold later being traced to him.

### *SMITH's Firearms Purchases*

10.      A review of **SMITH's** ATF National Tracing Center ("NTC") Multiple Sale Summary reports, other law enforcement databases, and FFL records, showed that, between August 21, 2020, and April 11, 2022, **SMITH** purchased approximately eighty-five (85) firearms during 42 separate transactions with various FFLs in Virginia.

11.      For each of the 42 transactions, **SMITH** was required to truthfully complete a Form 4473 and to present a valid Virginia identification.  During each purchase, **SMITH** provided a Virginia driver's license that showed an address on 29th Street in Newport News, Virginia ("LOCATION 1").  For question 10 of each Form 4473, which asks for the buyer's address, **SMITH** listed his address as being LOCATION 1, an address on South Rolfe Street in Arlington, Virginia ("LOCATION 2"), or a different address on South Rolfe Street in Arlington, Virginia ("LOCATION 3").  In addition, **SMITH** responded "Yes" to a question on each Form 4473, indicating that he was the actual buyer of the firearms, as opposed to a straw purchaser. On a separate question on each Form 4473, **SMITH** certified by signature that his answers were

5

"true, correct, and complete," and that he understood that "making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law." A warranted search of **SMITH's** person and his Maryland residence on April 18, 2023, yielded only two firearms, which gives reason to believe that **SMITH** has resold nearly all of the 85 firearms he purchased in Virginia since 2020.

12.     As set forth below, four of the firearms **SMITH** purchased in Virginia have since been recovered by law enforcement officers in Maryland during arrests or criminal investigations of individuals other than **SMITH**.  The serial numbers of each of these four firearms had been obliterated prior to their recovery.  Based on my training and experience, these recoveries associated with criminal activity shortly after the firearms were purchased out of state indicates **SMITH** is involved in firearms trafficking.  Additionally, because all four recovered firearms had their serial numbers obliterated, and a warranted search of **SMITH's** vehicle on April 28, 2023 yielded a Dremel rotary tool with a tapered carving bit attached, there is probable cause to believe **SMITH** obliterated the serial numbers of the firearms he purchased.

### *Maryland Firearms Recoveries Linked to SMITH*

13.     On January 12, 2022, officers of the Prince George's County Police Department ("PGPD") recovered a Sig Sauer, model P365, 9mm, semi-automatic handgun in the possession of Quadree Smith, who was stopped on suspicion of a narcotics offense.[2]  The serial number was obliterated at the time it was recovered but was later determined by the PGPD Firearms Examination Unit ("FEU") to be 66B387321.  The ATF NTC determined that **SMITH** originally

---

[2] For reasons set forth later in this affidavit, Quadree Smith may be related to **SMITH**.

purchased the firearm from C4A, an FFL in Virginia, on March 18, 2021, 300 days before PGPD recovered it.

14.     On January 27, 2022, PGPD recovered a Taurus, model G3C, 9mm semi-automatic handgun in the possession of an individual with the initials A.S. during a traffic stop. At the time of his arrest, A.S. was in a vehicle with multiple convicted felons, including an individual who had been convicted of an offense related to firearms trafficking in a prior ATF investigation. The serial number was obliterated at the time the firearm was recovered but was later determined by the PGPD FEU to be ABL137553. The ATF NTC determined that **SMITH** originally purchased the firearm from C4A, an FFL in Virginia, on November 24, 2020, 429 days before PGPD recovered it.

15.     On March 2, 2022, PGPD recovered a Canik, model TP-9, 9mm semi-automatic handgun in the possession of an individual with the initials A.M. during a traffic stop. The serial number was obliterated at the time it was recovered but was later determined by the PGPD FEU to be 21BJ09727. The ATF NTC determined that **SMITH** originally purchased the firearm from C4A, an FFL in Virginia, on October 29, 2021, 124 days before PGPD recovered it.

16.     On March 4, 2022, PGPD recovered a Taurus, model G3C, 9mm semi-automatic handgun in the possession of an individual with the initials J.B. after J.B. apparently shot someone accidentally. The serial number was obliterated at the time it was recovered but was later determined by the PGPD FEU to be ACK351977. The ATF NTC determined that **SMITH** originally purchased the firearm from C4A, an FFL in Virginia, on November 13, 2021, 111 days before PGPD recovered it.

*Interview of SMITH*

17.     On May 2, 2022, law enforcement interviewed **SMITH** at a residence located on 24th Avenue in Temple Hills, Maryland, associated with him in a commercial database commonly used by law enforcement ("**SMITH's Maryland Residence**").

18.     During the interview, **SMITH** confirmed that he uses the telephone number, 240-460-0745 (hereinafter, "**SMITH's PHONE NUMBER**"), and afterwards responded to a text message from law enforcement from **SMITH's PHONE NUMBER**. During the interview, **SMITH** also stated that the residence he had just emerged from was not his but belonged instead to his wife. **SMITH** stated that his wife resided there, while **SMITH** resided primarily at a residence in Newport News, Virginia, the same city as LOCATION 1. **SMITH** further stated that he had purchased firearms in Virginia. When asked about a specific firearm, **SMITH** stated, "Give me the serial number. And allow me to go through my inventory and check on that and see what's going on." **SMITH** further stated that he possessed licenses to carry concealed firearms in Maryland, DC, and Virginia, and showed these licenses to law enforcement.

19.     An employee of the Arlington County Circuit Court provided records showing that **SMITH** applied for a permit to carry a concealed weapon on June 11, 2020, and was subsequently issued that permit. **SMITH** listed LOCATION 2 as his "Residential Address" on the application.

20.     The Maryland State Police ("MSP") provided records showing that **SMITH** applied for a permit to carry a concealed weapon on June 19, 2020, and was issued that permit on March 30, 2021. **SMITH's** address is listed in the records as **SMITH's Maryland residence**.

21.     The District of Columbia, Metropolitan Police Department ("MPD") provided records showing that **SMITH** applied for a permit to carry a concealed weapon on September 10,

2020, and was issued that permit on or about September 16, 2020. **SMITH's** address is listed in the records as **SMITH's Maryland Residence**.

22.     A commercial database commonly used by law enforcement associated Quadree Smith, mentioned above in paragraph 13, with **SMITH's Maryland Residence** and identifies **SMITH** as a possible relative. Also, the address listed on Quadree Smith's Maryland driver's license is **SMITH's Maryland Residence**. For these reasons, your Affiant believes Quadree Smith may be a relative of **SMITH**.

### *SMITH's Listed Addresses in Virginia*

23.     On May 6, 2022, I queried an open-source property records database for LOCATION 1. The listed owner will be shown here as, "LOCATION 1 OWNER."

24.     On May 31, 2022, law enforcement met with LOCATION 1 OWNER, who stated that they are the current owner of LOCATION 1 and have resided there for several years. They stated that they knew **SMITH** and that their aunt is **SMITH's** wife. They further stated that **SMITH** had never been to LOCATION 1, had never resided there, and had never been in possession of a key to the residence. They further stated that **SMITH's** wife had arranged with them for a voter registration card in **SMITH's** name to arrive in the mail at LOCATION 1, and for LOCATION 1 OWNER to send the card to **SMITH's** wife. They further stated that they received the voter registration card in the mail and believed that they sent it to **SMITH's** wife, but did not recall specifically doing so.

25.     On June 1, 2022, I queried an open-source property records database for LOCATION 2. The listed owner will be shown here as, "LOCATION 2 OWNER."

26.     On June 3, 2022, law enforcement met with LOCATION 2 OWNER, who stated that they are the current owner of LOCATION 2 and have resided there since November 2021.

They further stated that they know the previous owners, a couple who will be shown here as, "LOCATION 2 PRIOR OWNER 1," and "LOCATION 2 PRIOR OWNER 2."  LOCATION 2 OWNER stated that they did not know **SMITH**, and that **SMITH** did not, and had never to their knowledge, resided at LOCATION 2.

27.     On June 3, 2022, law enforcement spoke with LOCATION 2 PRIOR OWNER 1 on the phone.  They stated that they, their spouse, LOCATION 2 PRIOR OWNER 2, and their children, lived at LOCATION 2 from August 2017 to August 2021.  They further stated that they did not know **SMITH**, and that **SMITH** did not, and had never to their knowledge, resided at LOCATION 2.

28.     On June 3, 2022, law enforcement spoke with LOCATION 2 PRIOR OWNER 2 on the phone.  They stated that they, their spouse, LOCATION 2 PRIOR OWNER 1, and their children, lived at LOCATION 2 from August 2017 to September 2021.  They further stated that they did not know **SMITH**, and that **SMITH** did not, and had never to their knowledge, resided at LOCATION 2.

29.     On June 6, 2022, I called the Arlington County Department of Real Estate Assessments and spoke with an employee who searched several databases for LOCATION 3 but was unable to locate any records.  The employee stated, "It does not look like this address was ever real."

30.     On June 7, 2022, I reviewed Virginia Department of Motor Vehicles ("DMV") records that indicated that **SMITH** completed an application for a Virginia driver's license on August 19, 2020, and listed LOCATION 1 as his address on the application.  The records also indicated that **SMITH** provided **SMITH's Maryland Residence** as his address when applying for a vehicle title.

10

*SMITH's True Residence Is in Maryland, not Virginia*

31.     There is probable cause to believe that between August 21, 2020 (the date of **SMITH's** first known firearm purchase) and April 11, 2022 (the date of **SMITH's** last known firearm purchase), **SMITH** resided in Temple Hills, Maryland, not Virginia. Thus, **SMITH** made false statements on his Forms 4473 when he stated that he resided in Virginia.

32.     I reviewed Maryland Motor Vehicle Administration ("MVA") documents and learned that on August 23, 2021, **SMITH** applied for certificate of title for a 2018 Volvo sedan ("VOLVO VEHICLE") and listed on the application as the "Applicant's Street Address" **SMITH's Maryland Residence**. I also learned that on March 23, 2018, **SMITH** applied for certificate of title for a 2015 Chevrolet sedan ("CHEVY VEHICLE") and listed on the application as the "Applicant's Street Address" **SMITH's Maryland Residence**.

33.     I also learned that on November 27, 2020, **SMITH's** wife, LaTasha Smith, applied for certificate of title for a 2021 Honda sport utility vehicle ("HONDA VEHICLE") listed on the application as the "Applicant's Street Address" **SMITH's Maryland Residence**.

34.     I also learned the Maryland license plate identifiers for the VOLVO VEHICLE, CHEVY VEHICLE, and HONDA VEHICLE. A query of a commercial License Plate Reader ("LPR") database showed that the VOLVO VEHICLE, CHEVY VEHICLE, and HONDA VEHICLE have been observed in Maryland and no other state. Most of the observations occurred near **SMITH's Maryland Residence** in 2022, and during the late evening and early morning hours, when an individual would typically be sleeping in their residence.

35.     A commercial database commonly used by law enforcement associated **SMITH** with numerous addresses in Maryland and D.C., and only one Post Office Box in Virginia in 2022.

36.     The Maryland Coordination and Analysis Center ("MCAC") provided information for **SMITH** showing employment in Maryland from 2016 to 2021.  MCAC also provided information in their unemployment database that associated **SMITH** with **SMITH's Maryland Residence**.

37.     The Virginia Fusion Center ("VFC") provided information for **SMITH** showing employment in Virginia in the third quarter of calendar year 2022 only, which includes the months of July, August, and September.  This is outside the period of **SMITH's** known firearm purchases.

38.     On August 18, 2022, a Federal Search Warrant (1:22-SW-449) was issued by the Honorable Theresa C. Buchanan, United States Magistrate Judge, in the Eastern District of Virginia ("EDVA") for records and location information associated with the cellular telephone ("**SMITH's PHONE**") assigned to **SMITH's PHONE NUMBER** from August 1, 2020, to August 18, 2022.  The subscriber and location data obtained from the information disclosed pursuant to the search warrant revealed that the user of **SMITH's PHONE** was **SMITH**, and that **SMITH** was a Maryland resident.  None of the disclosed location data that reflected early morning hours when an individual would typically be sleeping in their residence showed **SMITH's PHONE** in Virginia.  Also, none of the disclosed location data showed **SMITH's PHONE** in or near Newport News, where LOCATION 1 is located.

39.     The data also revealed that on multiple separate occasions corresponding to dates on Forms 4473 on which **SMITH** purchased firearms, the user of **SMITH's PHONE** traveled from Temple Hills, Maryland, to the vicinity of the FFL at which **SMITH** purchased firearms each day, and then back to Temple Hills, Maryland.  Specifically, on April 6, 2022, **SMITH's** phone activated a cell site near **SMITH's Maryland Residence** throughout the morning, then

activated a cell site near Trojan Arms, the FFL at which **SMITH** rendered payment for a firearm that day, and then activated a cell site near **SMITH's Maryland Residence** in the evening.  On April 11, 2022, **SMITH's** phone activated a cell site near **SMITH's Maryland Residence** throughout the morning, then activated a cell site near Trojan Arms, where **SMITH** certified the purchase of a firearm that day, and then activated a cell site near **SMITH's Maryland Residence** in the evening. On April 14, 2022, **SMITH's PHONE** activated a cell site near **SMITH's Maryland Residence** throughout the morning, then activated a cell site near Trojan Arms, where **SMITH** took possession of a firearm that day, and then activated a cell site near **SMITH's Maryland Residence i**n the evening.  Similar patterns were identified in 2021, and 2020.

40.     On September 26, 2022, a subpoena was issued to Block, Inc (CashApp) in EDVA for subscriber information and other records associated with S**MITH's PHONE NUMBER** and other identifiers known for **SMITH**.  The information disclosed pursuant to the subpoena showed that **SMITH** was the account holder of a CashApp account and that he provided **SMITH's Maryland Residence** as his address.

41.     On January 25, 2023, a subpoena was issued to the Potomac Electric Power Company (PEPCO) in EDVA for subscriber information and other records associated with **SMITH's Maryland Residence** and other identifiers known for **SMITH**.  The information disclosed pursuant to the subpoena showed that **SMITH** was an account holder and that **SMITH's Maryland Residence** was listed as **SMITH's** mailing address.  The information disclosed pursuant to the subpoena further showed that **SMITH** was removed from the account on July 19, 2022, approximately eleven weeks after law enforcement interviewed **SMITH**.

42.     On January 25, 2023, a subpoena was issued to Truist Financial in EDVA for subscriber information and other records associated with **SMITH's Maryland Residence** and other identifiers known for **SMITH**.  The information disclosed pursuant to the subpoena showed that **SMITH** was an account holder and that **SMITH's Maryland Residence** was listed as **SMITH's** mailing address.

43.     On January 25, 2023, a subpoena was issued to Navy Federal in EDVA for subscriber information and other records associated with **SMITH's Maryland Residence** and other identifiers known for **SMITH**.  The information disclosed pursuant to the subpoena showed that **SMITH** was an account holder and that **SMITH's Maryland Residence** was listed as **SMITH's** mailing address.

### *SMITH's Arrest and Discovery of SUBJECT DEVICE*

44.     On April 13, 2023, a Federal Arrest Warrant (1:23-MJ-83) was issued by the Honorable John F. Anderson, United States Magistrate Judge, in EDVA, for **SMITH** for violations of Title 18, United States Code, Section 924(a)(1)(A).

45.     On April 17, 2023, a Federal Search Warrant (23-mj-1216-AAQ) was issued by the Honorable Ajmel A. Quereshi, United States Magistrate Judge, in the District of Maryland for **SMITH's Maryland Residence**.

46.     On April 18, 2023, law enforcement executed the search warrant for **SMITH's Maryland Residence**.  Specifically, at approximately 5:39 a.m., law enforcement observed the VOLVO VEHICLE arrive and park in front of **SMITH's Maryland Residence**.  At approximately 6:05 a.m., law enforcement observed **SMITH** walking away from the VOLVO VEHICLE and enter **SMITH's Maryland Residence**.  At approximately 6:10 a.m., law enforcement entered **SMITH's Maryland Residence** and executed the search warrant.

14

47.     **SMITH** was found inside the residence, and in the entryway near the front door. **SMITH** was fully clothed, wearing boots, and his attire included multiple layers of clothing. **SMITH** was taken into custody pursuant to the arrest warrant. During the search of **SMITH's** person, law enforcement found two firearms, **SMITH's** Virginia driver's license, the key to the VOLVO VEHICLE, and other items. During the search of the residence, law enforcement did not find any firearms other than the two firearms **SMITH** possessed on his person. During the search of the residence, law enforcement encountered an individual inside the residence who identified herself as LaTasha Smith, **SMITH's** wife. LaTasha Smith provided her phone number to law enforcement. While executing the search warrant, law enforcement took the VOLVO VEHICLE into custody.

48.     On April 27, 2023, a Federal Search Warrant (8:23-mj-01139-GLS) was issued by the Honorable Gina L. Simms, United States Magistrate Judge, in the District of Maryland for the VOLVO VEHICLE. That warrant authorized the seizure of "any computerized or electronic records including cellular telephones, relating to the ordering, purchase or possession of firearms" found in the VOLVO VEHICLE.

49.     On April 28, 2023, law enforcement executed the search warrant for the VOLVO VEHICLE. During the search of the vehicle, law enforcement found a variety of firearm paraphernalia including handgun boxes, ammunition, and magazines, as well as a Dremel rotary tool with a tapered carving bit attached. Law enforcement also found copious amounts of mail matter and other documents in **SMITH's** name, and a black and green Samsung cellular telephone, the **SUBJECT DEVICE**, in the glove box. Law enforcement took the **SUBJECT DEVICE** into custody and entered it into evidence as ATF Exhibit #53.

15

50.     Based on this information, **SMITH's** cellular phone location data, **SMITH's** frequent use of a Maryland address to identify his home address, the lack of corroboration for **SMITH's** residency at any of the Virginia addresses he listed on Forms 4473 when purchasing firearms, **SMITH's** physical presence at a Maryland residence on May 2, 2022 and April 18, 2023, and **SMITH's** statement that **SMITH's** wife owns that Maryland residence, there is reason to believe that **SMITH** resided with his wife in Maryland during the time period in which he purchased numerous firearms in Virginia.

51.     There is probable cause to believe that **SMITH**, while residing in Maryland, used LOCATION 1 OWNER's address in Newport News, Virginia, to obtain a Virginia driver's license and then used that Virginia driver's license to purchase 85 firearms in Virginia between August 21, 2020, and April 11, 2022.  Specifically, in May and June of 2022, law enforcement interviewed four people who resided at the addresses in Virginia that are listed on **SMITH's** Virginia driver's license and Forms 4473.  Of the three Virginia addresses **SMITH** used, one was not a valid address, and residents of the other two addresses stated that **SMITH** had never lived at those addresses.  Additionally, location data associated with **SMITH's PHONE** showed that the user of **SMITH's PHONE** is a Maryland resident, did not stay overnight in Virginia once, and never traveled to or near LOCATION 1.

## IDENTIFICATION OF THE ITEMS TO BE SEARCHED/EXAMINED

52.     The **SUBJECT DEVICE** seized during execution of the aforementioned warrant is currently located within the District of Maryland in the custody of the ATF Hyattsville II Field Office located at 7833 Walker Drive, Greenbelt, Maryland 20770.  The **SUBJECT DEVICE** remains in the same condition in which it was seized.

53.     As described above, there is probable cause to believe that the **SUBJECT DEVICE** contains evidence of **SMITH's** and his coconspirators' criminal activities.

54.     Based on my training and experience, I know that individuals who illegally straw purchase firearms use their cellular phones to communicate with the individuals for whom they purchase firearms, using text messages, images, and videos.

55.     As described in Attachment B, I seek authorization to search for and seize: 1) items that constitute the fruits, evidence, contraband, and instrumentalities of violations of 18 U.S.C. § 924(a)(1)(A), Making False Statements Pertaining to Firearms Purchases, and § 922(k), Possession of a Firearm with an Obliterated Serial Number, including firearms, ammunition, component parts of firearms, such as ammunition magazines (or "clips"), silencers, laser sights, rotary ("Dremel") tools, or carving tool bits; 2) indicia of **SMITH's** purchase or sale of firearms, ammunition, component parts of firearms, such as ammunition magazines (or "clips"), silencers, laser sights, rotary tools, or carving tool bits; and 3) documents, records, photographs, videos, and communications, in physical, electronic or digital form, pertaining to the purchase, receipt, sale or transfer of firearms, ammunition, component parts of firearms, such as ammunition magazines (or "clips"), silencers, laser sights, rotary tools, or carving tool bits.

56.     As described above, there is probable cause to believe that **SMITH** used a cellular telephone or computer under his control to traffic firearms.  As set forth in Attachment B, I seek authorization to search for electronic evidence of the possession, purchase, receipt, sale or transfer of firearms, ammunition, and component parts of firearms, such as ammunition magazines (or "clips"), silencers, laser sights, or rotary tools.

57.     The applied-for warrant would authorize the forensic examination of the

**SUBJECT DEVICE** for the purpose of identifying electronically stored data particularly

described in Attachment B.

## TECHNICAL TERMS

58.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

a.  *Wireless telephone*:  A wireless telephone (or mobile telephone, or cellular

telephone) is a handheld wireless device used for voice and data communication

through radio signals.  These telephones send signals through networks of

transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones.  A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and

from the phone.  In addition to enabling voice communications, wireless

telephones offer a broad range of capabilities.  These capabilities include:  storing

names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages and e-mail; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing

dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the

location of the device.

b.  *Digital camera*:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a

18

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader. Removable

storage media include various types of flash memory cards or miniature hard

drives. Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to

photographs or videos.

c.  *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files. However, a portable media player can also store other

digital data. Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives. This removable storage media can also store any digital

data. Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

d.  *GPS*: A GPS navigation device uses the Global Positioning System to display its

current location. It often contains records of the locations where it has been.

Some GPS navigation devices can give a user driving or walking directions to

another location. These devices can contain records of the addresses or locations

involved in such navigation. The Global Positioning System (generally

abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each

satellite contains an extremely accurate clock. Each satellite repeatedly transmits

19

by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  *PDA*:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include GPS technology for determining the location of the device.

f.  *IP Address*:  An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly

from its source to its destination.  Most Internet service providers control a range

of IP addresses.  Some computers have static—that is, long-term—IP addresses,

while other computers have dynamic—that is, frequently changed—IP addresses.

g.  *Internet*:  The Internet is a global network of computers and other electronic

devices that communicate with each other.  Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

59.   Based on my training, experience, and research, and from consulting the

manufacturer's advertisements and product technical specifications available online, I know that

the **SUBJECT DEVICE** could have capabilities that allow them to serve as a wireless

telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my

training and experience, examining data stored on devices of this type can uncover, among other

things, evidence that reveals or suggests who possessed or used the device.

## FORENSIC STORAGE AND FORENSIC ANALYSIS

60.   Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can

sometimes be recovered with forensics tools.

61.   *Forensic evidence.*  As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the **SUBJECT DEVICE** was used, the purpose of its use, who used it, and when.  There is

probable cause to believe that this forensic electronic evidence might be on the **SUBJECT DEVICE** because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.   Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

62.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **SUBJECT DEVICE** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## **CONCLUSION**

63.    Based upon the facts set forth above, I submit there is probable cause to believe that **ROBERT NMN SMITH**, has maintained continuous residence in Maryland while purchasing firearms in Virginia and indicating on numerous ATF Forms 4473 that he resided in Virginia, thereby knowingly providing false information on a record required to be maintained by an FFL in violation of 18 U.S.C. § 924(a)(1)(A), and, further, that SMITH possessed and transported in interstate commerce weapons with obliterated serial numbers, in violation of 18 U.S.C. § 922(k), and that evidence, contraband, and fruits and instrumentalities of such crime, as described in Attachment B, will be located in the **SUBJECT DEVICE** described in Attachment A.

64.    This Court has jurisdiction to issue the requested warrants pursuant to Federal Rule of Criminal Procedure 41(b)(1).  Specifically, "a magistrate judge with authority in the district …  has authority to issue a warrant to search for and seize a person or property located within the district."  Fed. R. Crim. Proc. 41(b)(1).

65.    *Manner of execution.*  Because these warrants seek permission to examine items already in law enforcement's possession, the execution of these warrants does not involve the

physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

Respectfully submitted,

MATTHEW BROWN Digitally signed by MATTHEW BROWN
Date: 2023.05.24 20:44:45 -04'00'

Matthew Brown
Special Agent (ATF)

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 and 41(d)(3) by telephone, this _____26th_____ day of May 2023.

The Honorable Ajmel A. Quereshi
United States Magistrate Judge

## <u>ATTACHMENT A</u>

## PROPERTY TO BE SEARCHED

The property to be searched is a black and green Samsung cellular telephone, entered into evidence as ATF Exhibit #53, seized by law enforcement during the execution of a Federal Search Warrant on April 28, 2023 ("**SUBJECT DEVICE**").

The **SUBJECT DEVICE** is currently located within the District of Maryland in the custody of the ATF Hyattsville II Field Office, which is located at 7833 Walker Drive, Greenbelt, Maryland 20770.

The applied-for warrant would authorize the forensic examination of the **SUBJECT DEVICE** for the purpose of identifying the electronically stored information described in Attachment B.

1

## ATTACHMENT B

## ITEMS TO BE SEIZED

All records beginning no later than August 1, 2020, contained in the items described in

Attachment A which constitute evidence of violations of, in violation of 18 U.S.C. §

924(a)(1)(A) and § 922(k) (the "TARGET OFFENSES"), as outlined below:

1.      Any information related to sources of firearms and/or privately made firearms

(PMFs) (including names, addresses, phone numbers, or any other identifying information);

2.      Contact lists and lists of sent and received calls with such contacts which could

identify SMITH's firearms buyers;

3.      Stored photographs, videos, and images relating to the TARGET OFFENSES;

4.      Digitally stored evidence relating to the types, amounts, and prices of drugs

and/or firearms trafficked as well as dates, places, and amounts of specific transactions;

5.      Any records of **SMITH's** schedule or travel to identify sources of supply of

firearms;

6.      All records of the types, amounts, and prices of firearms purchased or researched

as well as dates, places, and amounts of specific transactions;

7.      Bank account numbers, financial records, financial institutions, and other

financial data in the name of SMITH or others that may be related to firearms trafficking and

proceeds and payments;

8.      The contents of all instant messages associated with the **SUBJECT DEVICE**,

including stored or preserved copies of instant messages (including iMessages, SMS messages,

and MMS messages) sent to and from the account (including all draft and deleted messages), the

source and destination account or phone number associated with each instant message, the date

2

and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

9.      Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

10.      Any and all records related to the location of the user(s) of the **SUBJECT DEVICE**;

11.      Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

12.      Evidence of the times the **SUBJECT DEVICE** was used;

13.      Passwords, encryption keys, and other access devices that may be necessary to access the device;

14.      Documentation and manuals that may be necessary to access the device or to conduct a forensic examination of the device; and

15.      Contextual information necessary to understand the evidence described in this attachment.

16.      With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in

3

any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a.   surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b.   "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c.   "scanning" storage areas to discover and possibly recover recently deleted files;

d.   "scanning" storage areas for deliberately hidden files; or

e.   performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

17.    If, after performing these procedures, the directories, files, or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

18.    With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent

4

reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.